## DIAZ LAMOUTTE et al. v. LINCOLN NAT. LIFE INS. CO.

### No. 4483.

United States Court of Appeals
First Circuit.

April 26, 1951.

Hector Gonzales Blanes, San Juan, P. R., for appellants.

Gonzalo Sifre, San Juan, P. R. (Jaime Sifre, Jr., and Wilson P. Colberg, San Juan, P. R., with him on the brief), for appellee.

Before MARIS, WOODBURY and HARTIGAN, Circuit Judges.

HARTIGAN, Circuit Judge.

Plaintiffs-appellants filed suit as beneficiaries of a life insurance policy issued by the defendant-appellee to their father, Ignacio Diaz Luzunaris, who died January 1, 1946.

The appellee filed its answer and counterclaim alleging in substance that: (1) Insured, in his application for the policy, had made false and untrue statements, answers and representations, which were material to the risk and to the subject matter of the insurance for which reason the insurance contract has always been void and of no effect and (2) it was a condition of the contract that a policy should have been issued and received by the applicant and the first premium paid by him while in good health and that when Ignacio Diaz Luzunaris received the policy and paid the first premium he was not in good health in that he was suffering from latent lues, for which reason the contract was never in force.

The district court entered judgment dismissing the complaint and granting defendant's counter-claim from which judgment plaintiffs appealed.

The appellants list 17 points in their statement of points filed January 5, 1950, but in their brief rely upon the following 5 points:

"1. The evidence does not support the finding, nor that part of the judgment, which adjudges insured made untrue statements in application for the insurance policy upon answering Questions Nos. 10, 11, 14 and 15, thereof, propounded to him by the company's medical examiner.[1]

"2. There is no evidence to support the necessary finding that the statements in question influenced insurer's estimation of the risk.

"3. The trial court overlooked the application had been previously prepared by insurer and erroneously failed to rule that in the construction of its contents insured should be protected against obligations arising in the nature of a 'warranty', specially in view of the law and of the condition agreed upon in the insurance contract to the effect that any statement made by insured, or on his behalf in the application shall, in the absence of fraud, be deemed a representation and not a warranty.

"4. The evidence does not support the conclusion that at the time the insurance policy was received and accepted, and first premium paid, by Ignacio Diaz Luzunaris, the latter was not in 'good health' and suffering from 'neuro-lues', or 'latent-lues'.

"5. The lower court committed fundamental error when denying the admission of letters dated October 16, 1943 and October 28, 1943."

It appears from the record that the insured from 1932 until his death was a member of a medical institution known as "Auxilio Mutuo" and that he visited the clinic of said institution many times for medical consultation and treatment.

On the occasions when insured went to the institution for consultation he complained of gastric disturbances, pains in different regions of the body, difficulty in

---

1. The pertinent parts of said application and its questionnaire read as follows:

"Every question must be asked the applicant by the Medical Examiner and the applicant's answers recorded in the Examiner's own handwriting and in ink. The applicant's signature must be made in the Examiner's presence. Examinations must be made in private. * * *

"10. When did you last consult a physician and for what? Oct.—1943.

"Name of Physician—Dr. Bonelli.

"Address of Physician—Santurce, P. R.

"Illness—Malaria.

"Duration of illness—15 days.

"11. Have you ever undergone a surgical operation?—Yes, amputation 1st phalanx of 4th left finger.

"Name of Surgeon—Dr. Bright.

"Address of Surgeon—Humacao, P. R."

Question 14 included 28 inquiries as to diseases or symptoms which the applicant was required to answer either "yes" or "no". To the question "Malaria, Typhoid or other Fevers?" he answered "yes". As to all the rest he answered "no" including questions as to "Mental Derangement or any Nervous Disease?" "Syphilis, Gonorrhea or Stricture?" "Gout or Rheumatism?" etc.

"15. Have you consulted any physician not included in any of the above answers? Give name and addresses of physicians, list ailments or accidents and dates.—No."

walking, etc. In 1943 the director of the institution, Dr. Roldan, in view of the symptoms he saw in the insured, referred him to Dr. Homedes, a specialist of the nervous system. Dr. Homedes after various tests treated the insured for neurolues. He also treated him for malaria as did Dr. Bonelli.

The insured made application for the policy of insurance April 10, 1945. In September, 1945 insured had a coronary thrombosis and he died on January 1, 1946.

There is ample testimony in the record to support the finding of the court below "That at the time that insurance policy No. 803646 was received and accepted by Ignacio Diaz Luzunaris and the first premium paid by him, the insured Ignacio Diaz Luzunaris was not in good health in that he was suffering from 'latent lues'."

The insured consulted Dr. Homedes at least 25 times from November, 1943 to May, 1945. Although insured may not have been told by Dr. Homedes that he had latent lues, he was aware that he had a nervous disease. Dr. Homedes gave him over 30 injections of tri-parysomide, a drug which is used for the treatment of nervous syphilis.

The application of the insured completely failed to disclose that he had consulted Dr. Homedes at all. (See Footnote above, questions 10 and 15). He stated in his application that the last time he consulted a physician was in October, 1943 when he consulted Dr. Bonelli for malaria when in fact he was under treatment with Dr. Homedes as late as May, 1945. Thus, while he was still consulting Dr. Homedes, the insured made application for the policy in issue here.

Dr. Ferrer, a syphilologist and urologist testified as follows:

" * * * Everything is confusing, until Doctor Homedes took hold of the case and from the history that he had of a primary lesion, of a chancre in 1928, which might be latent for lack of treatment or from incomplete treatment or no treatment at all, because I don't know from what you have told me if he had any treatment at all, the only positive diagnosis that can be made is that this is so typical it is a primary lesion of Lues. * * *

* * * * * *

" * * * as far as I myself am concerned I would never dare use Tri-Parysomide to try to help a patient's physical condition because it is a dangerous drug, such a dangerous drug that it might produce permanent blindness, and that is no poppycock."

The record further discloses: "Q. In your opinion, Doctor, as a syphilologist, would any competent syphilologist recommend Parysomide, except in a case of Neuro-Lues? A. It is recommended, it is the drug *per se,* to use for Neuro-Lues; Tri-Parysomide."

Two other experts also corroborated Dr. Homedes in his diagnosis. Dr. Marina said there was enough "to make a diagnosis of Neuro-Syphilis," and that the insured's disease was "almost a text-book picture" of syphilis.

Dr. Cabrera's opinion was that if he were making a diagnosis he did not believe he could make any other than that of neuro-lues.

The ambiguity suggested by the appellants in questions 10 and 15 is fictitious. Dr. Homedes as indicated, although attached to the "Auxilio Mutuo", was a physician and one who was treating insured for over a year and was still seeing him at the time insured applied for insurance. That Dr. Homedes was attached to the "Auxilio Mutuo" did not excuse the insured from answering questions 10 and 15 unequivocally in accordance with the true facts.

The case of Ettelson v. Metropolitan Life Ins. Co., 3 Cir., 1947, 164 F.2d 660, upon which the appellants place weight is clearly distinguishable from the instant case. In the Ettelson case the insured's physician, Dr. Levy, sent insured to two other physicians for X-ray and for blood count examinations. These doctors made their reports to Dr. Levy. The court held that the insured's failure to mention these

two physicians in answer to question 12(g), "Have you consulted a physician for any ailment or disease not included in the above answers?" was true and sufficiently complete in that the question was framed in the singular and that in answer to question 12(g) the insured had mentioned Dr. Levy.

At page 666 of 164 F.2d the court said as to question 13, ("What clinics, hospitals, physicians, healers or other practitioners, if any, not named above, have you consulted or been treated by, within the past five years?") which the insured answered "None": "* * * we think it may with some logic be urged that Dr. Levy rather than the insured consulted Dr. Roemer and Dr. Cohen. * * *"

The record here clearly discloses that the insured consulted Dr. Homedes many times over a long period of time before he applied for the policy of life insurance. That the director of the "Auxilio Mutuo" sent the insured to Dr. Homedes does not negate the fact that the insured consulted Dr. Homedes as his physician. The appellants' contention that Dr. Homedes was merely an intern at the "Auxilio Mutuo" is not supported by the record.

■ The failure of the insured to mention Dr. Homedes was an important fact and was considered as such by the district court in its findings as to questions 10 and 15 in the application. See Rigby v. Metropolitan Life Ins. Co., 240 Pa. 332, 87 A. 428.

There is sufficient support for the findings of fact of the district court except possibly its findings as to insured's answer to question 11, but that finding does not affect the result reached. The relevant findings are not clearly erroneous and consequently should not be set aside. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.

The materiality of the statements of the insured in his answers is clear. There is testimony that had the insurer been informed of the true facts, the risk would have been rejected. The application signed by the insured states: "I expressly agree * * * as follows: 1. All statements and answers contained herein * * are correctly recorded and are material."

The Puerto Rico statute (Sec. 299 of the Code of Commerce of Puerto Rico, Ed.1932) provides as follows:

"Section 299. An insurance contract shall be void:

"1. By reason of the bad faith of any of the parties at the time of the execution of the contract.

"2. By reason of the incorrect declaration of the insured, even though made in good faith, provided it may influence the estimation of the risk.

"3. By reason of the omission or concealment on the part of the insured, of facts or circumstances which may have influenced the execution of the contract."

■ Thus even the good faith of an applicant is no aid to him in a situation such as we have here if the incorrect declaration of the insured influenced the estimation of the risk. The insured's statements were in fact found by the district court to be "false and untrue statements." There is ample evidence to support the conclusion that the statements made by the insured influenced the insurer's estimation of the risk.

We find no merit in point 3 in appellants' brief pertaining to the distinction between a warranty and a representation. It does not appear that the court below considered the statements of the insured as warranties but rather considered them as material representations. The appellee also regarded the insured's statements as representations and not as warranties. The record discloses the materiality of these representations and their falsity.

The district court denied the admission of letters dated October 16, 1943 and October 28, 1943. The appellants contend that the denial was fundamental error.

These two letters relate to correspondence between Mr. Gonzalez Blanes, an attorney who happens to represent the appellants here, and the appellee; wherein Mr. Gonzalez Blanes complained that cer-

tain statements on his own application for insurance to appellee "are mistaken and do not correspond to the information which I gave Mr. Saldana and later Dr. Alfaro Diaz (medical examiner)."

Appellants offered to show by these letters that the appellee's examining physician in the past—specifically as to Mr. Gonzalez Blanes' application for insurance—had not reported correctly the answers given by him. In short, appellants contend that the medical examiner put down incorrect answers at least on one occasion although an applicant had supplied correct answers.

■ The matter was collateral, had little relation to this case and could not prove habit or custom. The exclusion of said letters in the circumstances here was not fundamental error.

The judgment of the district court is affirmed.